Filed 6/10/15  P. v. Williamson CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>      v.<br><br>VANESSA KAY WILLIAMSON,<br><br>      Defendant and Appellant. | C073738<br><br>(Super. Ct. No. 10F209) |

Defendant Vanessa Kay Williamson, who was involved romantically with multiple men, convinced one of her suitors, Robert James, to join her in robbing another of her suitors, Daniel Khelawan, who was in possession of prescription pain medication and a significant amount of money.  After James initially declined to participate in the robbery, defendant told James that Khelawan had threatened to kill her daughter, he was armed, and they should rob him at gunpoint so he would leave town rather than follow through on his threat.  Defendant then drove James, who was now armed with a semi-

automatic handgun and seated in the passenger seat of defendant's car, in search of Khelawan. When Khelawan drove past her car, defendant followed in pursuit. A brief car chase resulted in Khelawan's car spinning out of control in an intersection, defendant maneuvering her car to place James in front of Khelawan, and James opening fire when he saw "something" in Khelawan's hand. Khelawan righted his car and drove a short distance before veering off of the road. One of the bullets penetrated his aorta. He likely died before his car came to a stop.

Defendant was convicted by jury of first degree murder (Pen. Code, § 187, subd. (a))[1], assault with a semi-automatic firearm (§ 245, subd. (b)), and shooting at an occupied vehicle (§ 246). With respect to the murder, the jury found true a special circumstance allegation that the murder was intentional and perpetrated by means of discharging a firearm from a motor vehicle (§ 190.2, subd. (a)(21)); the jury also found true an enhancement allegation that one of the principals in the murder was armed with a firearm (§ 12022, subd. (a)(1)).[2] The trial court sentenced defendant to state prison to serve an indeterminate term of life without the possibility of parole (LWOP), plus a consecutive determinate term of ten years (upper term of nine years for the assault with a semi-automatic firearm, plus one year for the firearm enhancement; sentence imposed for shooting at an occupied vehicle was stayed pursuant to section 654).

On appeal, defendant contends: (1) the trial court prejudicially erred and violated her constitutional rights by instructing the jury with an argumentative and misleading special instruction on aiding and abetting liability; (2) the trial court also prejudicially erred and further violated her constitutional rights by denying her request

---

[1] Undesignated statutory references are to the Penal Code.

[2] Defendant's convictions followed her second trial, the first resulting in a mistrial after the jury failed to reach a verdict on any counts.

to instruct the jury on voluntary manslaughter based on imperfect self-defense and heat of passion; (3) the cumulative effect of the foregoing assertions of error requires reversal; (4) the trial court erred by imposing a consecutive term on her conviction for shooting at an occupied vehicle before staying execution of that sentence; and (5) the abstract of judgment must be corrected to conform to the oral pronouncement of judgment.

We reject defendant's assertions of instructional error. Because defendant did not object to the special instruction now challenged on appeal, she has forfeited this claim of error unless the error affected her substantial rights, i.e., resulted in a miscarriage of justice. (*People v. Anderson* (2007) 152 Cal.App.4th 919, 927.) The special instruction provided an accurate statement of the law and was neither misleading nor argumentative. Thus, there was no error, much less a miscarriage of justice. With respect to the trial court's denial of defendant's request for voluntary manslaughter instructions, we conclude defendant was not entitled to the requested instructions. We also reject defendant's assertion cumulative prejudice requires reversal. Finally, the Attorney General concedes defendant's assertion of sentencing error and further concedes the abstract of judgment must be corrected to conform to the oral pronouncement of judgment. We accept the concessions, modify the judgment to impose the middle term of five years on defendant's conviction for shooting at an occupied vehicle, stayed pursuant to section 654, and affirm the modified judgment. We further order correction of an error in the abstract of judgment. As defendant points out, the abstract of judgment reflects two one-year firearm enhancements, whereas only one such enhancement was imposed by the trial court. The abstract of judgment shall be corrected accordingly.

FACTS

Defendant met Khelawan in October 2009 at a cannabis club in Sacramento. They became friends and started a casual romantic relationship shortly thereafter. Khelawan

3

worked as a driver, delivering prescription medications and medical supplies from a warehouse in Sacramento to three medical facilities between Williams and Redding. At some point, defendant started to accompany Khelawan on his route, sharing in the driving responsibility and receiving money from him for doing so.

At the end of November, defendant moved from Sacramento to Redding. According to defendant, she made the move to be closer to her family and to "get away" from Khelawan, who was pressuring her to move in with him in Sacramento. Around this time, defendant started a romantic relationship with Kris Kingsley, whom she met through a social networking Website prior to moving to Redding. While defendant considered Kingsley to be her "boyfriend," she also continued her relationship with Khelawan, although she told her mother she "was just trying to make him happy so he would give [her] money . . . ." Indeed, while defendant was dating Khelawan, he gave her about $1,000, only $500 of which was payment for driving part of his route. He also bought defendant clothes, paid for her to get her hair and nails done, bought her food, cigarettes, and marijuana, and gave her daughter a video game system as a Christmas present. Defendant's relationship with Kingsley ended on New Year's Eve, when Kingsley saw a sexual text message she received from another man, Elliott Fitzgerald. The same day, defendant reconnected with a former boyfriend, James, who would ultimately—eight days later—shoot Khelawan to death.

In the week leading up to Khelawan's death, defendant and James saw each other every day and spent nearly every night together at James's father's house, where James was living. James "felt like [he] loved her." Two or three days before the shooting, defendant told James about Khelawan, saying she had been working for him as a "pill courier," but that would stop because Khelawan would not be delivering to Redding anymore. She added Khelawan had changed his route to deliver to Redding when she moved up there, and she "felt like he was stalking her." James asked whether Khelawan

4

was her boyfriend. Defendant answered that their relationship was "strictly professional."

The day before the shooting, defendant and James again talked about Khelawan. James asked defendant about the route she drove with him. Defendant responded they "could rob him" and "take the medications." James then asked what would be in the delivery. Defendant answered there would be sealed packages containing prescription medication either in Khelawan's back seat or in the trunk of the car. She also said Khelawan would be carrying about $1,500 in cash, and would have a gun in the car, so they would need to be armed if they were going to rob him. James considered defendant's proposal, but declined, telling defendant Khelawan would "probably suspect that it was her that did it" since "she knew where the route was."

On the day of the shooting, defendant and James drove to a pharmacy to pick up defendant's prescription for Norco, a combination of acetaminophen and hydrocodone, an opioid pain medication. While defendant was prescribed the medication for a knee injury, she did not take it, but instead sold the pills. James was addicted to prescription pain medication. He primarily took OxyContin, a more powerful narcotic, but would settle for Norco when he was unable to find his preferred medication. After picking up the prescription, defendant gave James five pills to alleviate withdrawal symptoms he was experiencing due to his being out of OxyContin. After running various errands during the afternoon and early evening, including two stops to the motel where defendant's family lived, and taking occasional breaks to smoke marijuana, they returned to James's house where they poured themselves a drink. Throughout the day, defendant was sending and receiving text messages on her cell phone. As the night progressed, she was doing so "continuously."

Meanwhile, Khelawan was driving his route from Sacramento to Redding. He left the warehouse in Sacramento shortly before 6:00 p.m. Earlier in the day, he and

5

defendant exchanged a series of text messages concerning a text message Khelawan had received two weeks before. Apparently, this previous text message was from a younger woman and included a nude self-picture. Khelawan apologized for his "stupidity," said the nude picture was "the farthest it went," and asked defendant to go with him back to Sacramento that night. Defendant's initial answer was, "No." Shortly before 7:00 p.m., her answer turned into a "maybe." By 7:40 p.m., she had returned to her original position, and by 8:20 p.m., she told Khelawan to have sex with whomever he wanted because she did not care. Khelawan responded he loved her and added, "don't do this." Defendant replied she would be too busy receiving oral sex to accompany him to Sacramento. Khelawan responded that was "fine," but he wanted his money back. He then sent a separate message clarifying he wanted the money he gave her to get her hair and nails done, as well as the Christmas present he gave her daughter. This latter text message read: "I want hair all nails ur lil 1 xmas gift." By this point, Khelawan was at a delivery stop in Red Bluff. The nurse who signed for the medications he delivered to this facility testified he seemed "down in the dumps" and was "on his cell phone." When she asked him what was wrong, Khelawan said he was having "problems with his girlfriend" and "was breaking up with her."

Back in Redding, after defendant and James had a drink in the kitchen, James went into his bedroom and took five more pills, leaving defendant to her text messaging. When defendant received the above-quoted text message, i.e., "I want hair all nails ur lil 1 xmas gift," she started screaming: "He's going to kill my baby." James went to defendant to calm her down and asked what she meant. Defendant explained Khelawan had sent her a text message saying he wanted her daughter's hair and nails, which James thought was "creepy." Khelawan then sent additional text messages demanding the money he had given defendant and saying he would be at the motel where her family lived in 15 minutes. Defendant responded that she was not at the motel.

6

Khelawan replied her family would be there, including her daughter. Defendant showed this message to James, said she wanted to go to the motel to protect her daughter, and told James to bring a gun. James asked whether she was sure, and then grabbed a semi-automatic handgun, along with the clip and a handful of bullets, from his father's bedroom. As they were leaving the house, defendant also mentioned Khelawan "wanted money back for things he had paid for," but said she had earned that money.

Defendant and James took defendant's car to the motel. James drove while defendant loaded the bullets into the magazine. At James's request, she placed the magazine in the glove compartment, and placed the gun under the passenger seat. On the way to the motel, Khelawan called defendant, who answered the phone and yelled: "You're not going to fuck with my family." She also yelled: "We have a gun too." James could not hear Khelawan's response to either of these statements. Defendant then put the call on speaker. Khelawan was "cussing and yelling." James then yelled into the phone: " 'I'm going to kill you.' " At this point, the phone call ended. According to defendant's account of this phone call, provided on the witness stand during her first trial and read into evidence during the second, in addition to yelling and cussing, Khelawan "said that he was gonna kill [her] family and that he was gonna blow up the motel up with -- blow it up with -- shoot the windows out."

Defendant and James continued to the motel, driving past a police station on the way. James considered stopping there to inform the police about Khelawan's purported threat to kill defendant's daughter, but explained: "It just seemed more important to get down to the motel first." When they arrived, defendant retrieved the gun and clip, combined the two, and got out of the car with the gun in her hand, beneath her shirt. James asked defendant what she was doing, took the gun, and placed it in his waistband. Khelawan's car was not in the motel parking lot. Nor had he stopped by

7

defendant's family's motel room. Inside the room, James told defendant's father that "they should probably move to a different motel," who responded: "We're not going anywhere." James then lifted his shirt and said he had a "strap" on. Additional text messages were exchanged between Khelawan and defendant. Defendant told Khelawan she was "at the room" and asked where he was. Between repeated demands for the money he had given defendant, and some vulgar insults, Khelawan responded he was across the street.

Defendant and James returned to the car and drove across the street. This time, defendant drove while James sat in the passenger seat with the gun. Khelawan was not there. Defendant told James she might know where Khelawan would be, based on the location of his last delivery stop, and again proposed robbing him, saying they "could rob him and scare him out of town at the same time." James decided to go along with the idea. He explained he thought he was "protecting her family and her daughter." Defendant then drove towards Khelawan's last stop for the night, a skilled nursing facility about two miles from the motel. They found Khelawan about a block from the facility as he drove through an intersection. Defendant said: "That's him. That's his car." She then followed Khelawan around the block and pulled up beside his car, in the oncoming lane of traffic. Both cars accelerated. At the next intersection, Khelawan's car spun out on the wet roadway, coming to a stop in the middle of the road, positioned perpendicular to the path of travel. Defendant also stopped, positioning her car at about a 45-degree angle to Khelawan's car, placing James directly across from Khelawan. As defendant's car came to a stop, James saw "something" in Khelawan's hand and opened fire. He fired a total of five rounds in rapid succession. One of the bullets struck Khelawan in the back, traveled through his chest cavity, and penetrated his aorta. Despite massive internal bleeding, Khelawan managed to right his car

8

and drive a short distance before veering off of the road and crashing into a neighboring yard.

Defendant and James did not follow through on their plan to rob Khelawan, but instead drove past his car as it crashed into the yard and continued on to James's house, where they spent the night. Defendant and James were arrested the next day. While in jail, defendant was overheard admitting she planned to rob Khelawan of pills and money. She also said she "had the best night's sleep of her life" the night he died.

DISCUSSION

I

### *Special Instruction on Aiding and Abetting Liability*

Defendant claims the trial court prejudicially erred and violated her constitutional rights by instructing the jury with an argumentative and misleading special instruction on aiding and abetting liability. Defendant did not object to this instruction at trial. "Failure to object to instructional error forfeits the issue on appeal unless the error affects defendant's substantial rights. [Citations.] The question is whether the error resulted in a miscarriage of justice under *People v. Watson* (1956) 46 Cal.2d 818, 299 P.2d 243. [Citation.]" (*People v. Anderson*, *supra*, 152 Cal.App.4th at p. 927.) We conclude there was no error, much less a miscarriage of justice.

A.

### *Additional Background*

Pursuant to a negotiated plea agreement, James pled guilty to voluntary manslaughter, assault with a semi-automatic firearm, and attempted second-degree robbery, with various firearm enhancements, and was sentenced to serve a stipulated prison term of 32 years 6 months, conditioned upon his agreement to cooperate with law enforcement and testify truthfully at all stages of any proceedings involving Khelawan's death. In accordance with this agreement, James provided damaging testimony against

9

defendant at trial, much of which was corroborated by testimony from other witnesses and forensic evidence.

The prosecution's theory was defendant was guilty of first-degree murder on either a robbery-murder theory or a premeditation and deliberation theory, and her state of mind was more culpable than that of James, despite the fact James pulled the trigger, because defendant "fed a lot of lies and misinformation" to James, inducing him to kill Khelawan.

After the jury was instructed with standard aider and abettor instructions, the jury was also instructed with the following special instruction: "An aider and abettor is responsible for her own state of mind not the actual perpetrator's state of mind. An aider and abettor may be guilty of a greater homicide offense than the actual perpetrator when the aider and abettor helped or induced the actual perpetrator to kill the victim and in doing so the aider and abettor's state of mind was more culpable than the actual perpetrator's state of mind based on the combined acts of both participants as well as the aider and abettor's state of mind. *An aider and abettor may also be guilty of a lesser homicide offense than the actual perpetrator when the aider and abettor's state of mind was less culpable than the actual perpetrator's state of mind based on the combined acts of both participants as well as the aider and abettor's individual state of mind.* The People have the burden of proving beyond a reasonable doubt the defendant's own state of mind." The italicized language was added to the instruction at defendant's request.

**B.**

*Analysis*

We first note the challenged instruction is a correct statement of the law. In *People v. McCoy* (2001) 25 Cal.4th 1111 (*McCoy*), our Supreme Court held: "[W]hen a person, with the mental state necessary for an aider and abettor, helps or induces another

to kill, that person's guilt is determined by the combined acts of all the participants as well as that person's own mens rea. If that person's mens rea is more culpable than another's, that person's guilt may be greater even if the other might be deemed the actual perpetrator." (*Id*. at p. 1122.) For example, "'[a]n accomplice may be convicted of first-degree murder, even though the primary party is convicted of second-degree murder or of voluntary manslaughter . . . if the secondary party, premeditatedly, soberly and calmly, assists in a homicide, while the primary party kills unpremeditatedly, drunkenly, or in provocation.'" (*Id*. at p. 1119.) Conversely, "an aider and abettor's guilt may also be less than the perpetrator's, if the aider and abettor has a less culpable mental state." (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1164; see also *People v. Nero* (2010) 181 Cal.App.4th 504, 507.)

Nevertheless, defendant argues the instruction provided a misleading and confusing definition of mens rea because the instruction first "directs the jury to consider only the aider and abettor's state of mind" and then "requires it to consider a combination of factors," i.e., the combined acts of both participants as well as the aider and abettor's state of mind. Defendant misreads the instruction. The instruction correctly informed the jury an aider and abettor is responsible for her or his own state of mind, not that of the direct perpetrator. An aider and abettor is, however, responsible for the actions of the direct perpetrator. Accordingly, in determining an aider and abettor's level of culpability, the jury was correctly instructed to consider the combined acts of both participants as well as the aider and abettor's state of mind. (See *McCoy*, *supra*, 25 Cal.4th at p. 1120 [aider and abettor liability "premised on the combined acts of all the principals, but on the aider and abettor's own mens rea"].) The instruction was neither misleading nor confusing.

Defendant also argues the following italicized language was argumentative: "An aider and abettor may be guilty of a greater homicide offense than the actual perpetrator

11

*when the aider and abettor helped or induced the actual perpetrator to kill the victim* and in doing so the aider and abettor's state of mind was more culpable than the actual perpetrator's state of mind based on the combined acts of both participants as well as the aider and abettor's [individual] state of mind."

"An instruction is argumentative when it recites facts drawn from the evidence in such a manner as to constitute argument to the jury in the guise of a statement of law. [Citation.] 'A jury instruction is [also] argumentative when it is "'of such a character as to invite the jury to draw inferences favorable to one of the parties from specified items of evidence.' [Citations.]"'" (*People v. Campos* (2007) 156 Cal.App.4th 1228, 1244, quoting *People v. Lewis* (2001) 26 Cal.4th 334, 380.) Contrary to defendant's argument on appeal, the special instruction neither recited facts drawn from evidence nor invited the jury to infer defendant "manipulated James into killing Khelawan." Instead, it correctly informed the jury an aider and abettor may be guilty of a greater homicide offense than the actual perpetrator where the aider and abettor helped or caused the actual perpetrator to commit the homicide, and did so with a more culpable mental state than that of the actual perpetrator. Nowhere in the instruction is there a recitation of manipulative acts engaged in by defendant or an invitation for the jury to conclude from these acts that defendant manipulated James into killing Khelawan. The instruction is not argumentative.

We conclude the trial court did not err in providing the jury with the challenged special instruction. There being no error, much less a miscarriage of justice, defendant's claim of instructional error is forfeited. (*People v. Anderson*, *supra*, 152 Cal.App.4th at p. 927.) For the same reason, we also reject defendant's alternative claim her trial counsel provided constitutionally deficient assistance by failing to object to, and seek correction of, the challenged instruction.

## II

### *Denial of Request for Voluntary Manslaughter Instructions*

Defendant also contends the trial court prejudicially erred and further violated her constitutional rights by denying her request to instruct the jury on voluntary manslaughter based on imperfect self-defense and heat of passion theories. She is mistaken.

In a criminal case, the trial court "must instruct on lesser included offenses, even in the absence of a request, whenever there is substantial evidence raising a question as to whether all of the elements of the charged offense are present. [Citations.] 'Substantial evidence is evidence sufficient to "deserve consideration by the jury," that is, evidence that a reasonable jury could find persuasive.' [Citation.]" (*People v. Lewis* (2001) 25 Cal.4th 610, 645; *People v. Souza* (2012) 54 Cal.4th 90, 114.) "On appeal, we review independently whether the trial court erred in failing to instruct on a lesser included offense." (*People v. Booker* (2011) 51 Cal.4th 141, 181.)

"Murder involves the unlawful killing of a human being with malice aforethought, but a defendant who intentionally commits an unlawful killing without malice is guilty only of voluntary manslaughter." (*People v. Blacksher* (2011) 52 Cal.4th 769, 832; §§ 187, subd. (a), 192.) "Generally, the intent to unlawfully kill constitutes malice. [Citations.] 'But a defendant who intentionally and unlawfully kills lacks malice . . . in limited, explicitly defined circumstances: either when the defendant acts in a "sudden quarrel or heat of passion" (§ 192, subd. (a)), or when the defendant kills in "unreasonable self-defense"—the unreasonable but good faith belief in having to act in self-defense [citations].' [Citation.]" (*People v. Breverman* (1998) 19 Cal.4th 142, 153-154.) "These mitigating circumstances reduce an intentional, unlawful killing from murder to voluntary manslaughter 'by *negating the element of malice* that otherwise inheres in such a homicide [citation].' [Citation.] *Provocation* has this effect because of the words of section 192 itself, which specify that an unlawful killing that lacks malice

13

because committed 'upon a sudden quarrel or heat of passion' is voluntary manslaughter. [Citation.] *Imperfect self-defense* obviates malice because that most culpable of mental states 'cannot coexist' with an actual belief that the lethal act was necessary to avoid one's own death or serious injury at the victim's hand. [Citations.]" (*People v. Rios* (2000) 23 Cal.4th 450, 461.)

As we explain below, there was no substantial evidence raising a question as to whether either mitigating circumstance existed in this case.

## A.

### *Imperfect Self-Defense Instruction Not Supported by the Evidence*

A defendant may not invoke the doctrine of imperfect self-defense where she or he, "through [her or] his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created circumstances under which [her or] his adversary's attack or pursuit is legally justified." (*In re Christian S.* (1994) 7 Cal.4th 768, 773, fn. 1.) Here, defendant set out in search of Khelawan with James, who was armed and under the influence of several drugs, and who believed, based solely on defendant's word, Khelawan was armed and had threatened to kill her daughter. Their intent was to rob Khelawan at gunpoint. When they found Khelawan driving down the street, defendant followed in pursuit, resulting in a brief car chase, Khelawan's car spinning out of control, and James opening fire when he saw an unknown object in Khelawan's hand. There can be no doubt defendant's wrongful conduct, i.e., an attempted armed robbery and misinformation provided to James, created the circumstances she now claims mitigated the murder to voluntary manslaughter.

Acknowledging the foregoing facts "mak[e] her appear to be the aggressor," defendant relies on *People v. Vasquez* (2006) 136 Cal.App.4th 1176 (*Vasquez*) in arguing the jury could nevertheless have found the doctrine of imperfect self-defense to apply. In that case, Vasquez invited his cousin Arechiga to join him and some of his friends in an

14

alley. In the alley, Vasquez, who was confined to a wheelchair, accused Arechiga of having raped Vasquez's deceased younger brother. The accusation caused Arechiga to lunge at Vasquez and begin to choke him, which in turn caused Vasquez to pull a gun and shoot Arechiga. (*Id*. at pp. 1177-1178.) At Vasquez's murder trial, the trial court declined to give the jury an instruction on imperfect self-defense, concluding Vasquez "created the need to defend himself by luring Arechiga to the alley to confront him." (*Id*. at p. 1179.) The Court of Appeal reversed, explaining: "Imperfect self-defense does not apply if a defendant's conduct creates circumstances where the victim is *legally* justified in resorting to self-defense against the defendant. [Citation.] But the defense is available when the victim's use of force against the defendant is unlawful, even when the defendant set in motion the chain of events that led the victim to attack the defendant." (*Id*. at pp. 1179-1180.) The court concluded that while Vasquez may have been "up to no good," an instruction on imperfect self-defense was nevertheless required because it was Arechiga who "used unlawful force first." (*Id*. at p. 1180.)

Defendant argues, "the jury could well have concluded that even though [she] might have set up the circumstances, neither she, nor James, engaged in any affirmative act of lethal force directed at [Khelawan] until after it appeared [Khelawan] was armed and prepared to fire at them. Thus, the jury could have concluded that neither [she], nor James, had any intent to kill [Khelawan] and [defendant] stopped the vehicle to end the encounter or avoid being hit by gunfire and/or James would have lowered the gun had be realized [Khelawan] was not in possession of a firearm." She further argues: "If the jury believed that [she] had no intent to kill at the time, and her intent merely was to scare [Khelawan], then [Khelawan's] act of pulling something black out of his pocket and pointing it in [her] and James's direction gave the appearance of [Khelawan's] intent to use unlawful force first. Under these circumstances, [defendant] was entitled to assert the

15

belief, albeit unreasonable, that she was in imminent peril and needed to resort to self-defense . . . ."

The question is not whether defendant intended to kill Khelawan when she chased him down the street with an armed and intoxicated boyfriend in her car, or whether her intent was simply to scare Khelawan into handing over the money and prescription pills in his possession. The question is whether defendant's criminal conduct, i.e., an attempted armed robbery, created circumstances in which Khelawan would have been legally justified in resorting to self-defense. The answer is yes. Moreover, unlike *Vasquez*, Khelawan did not use *any* force in self-defense. He merely had "something" in his hand when his car came to a stop in the intersection. Nor does the record support defendant's assertion Khelawan pulled this something out of his pocket and pointed it at her car. James simply testified Khelawan had an object in his hand. Having been told by defendant Khelawan was armed, we do not dispute a jury could have concluded *James* believed, albeit unreasonably, the something in Khelawan's hand was a gun, but there is no evidence *defendant* so believed. As we have explained, the belief in the need to use deadly force in self-defense negates the mental state of malice (*People v. Rios*, *supra*, 23 Cal.4th at p. 461), and the jury was required to assess defendant's mental state separately from that of James. (*People v. McCoy*, *supra*, 25 Cal.4th at pp. 1119, 1122.)

We conclude there is no substantial evidence, i.e., evidence a reasonable jury could find persuasive, supporting instruction on voluntary manslaughter based on imperfect self-defense.

### B.

### *Heat of Passion Instruction Not Supported by the Evidence*

The mitigating factor distinguishing the "heat of passion" form of voluntary manslaughter from murder is provocation. (*People v. Avila* (2009) 46 Cal.4th 680, 705.)

16

"The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim. [Citations.] The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. [Citations.] 'Heat of passion arises when "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment."' [Citation.]" (*People v. Lee* (1999) 20 Cal.4th 47, 59.)

Here, there is no substantial evidence of provocation. The only evidence Khelawan threatened defendant and her family came in the form of defendant's self-serving testimony in the prior trial, accompanied by her similarly self-serving out-of-court statements to James while trying to convince him to join her in robbing Khelawan, and to police after her arrest while trying to convince them that her actions were justified. The same is true of evidence Khelawan was armed. Moreover, defendant's statements concerning Khelawan being armed are contradicted by the fact no gun was found in his car following the murder. And her statements concerning Khelawan's purported threat to kill her daughter are contradicted by the actual text messages she received. In these text messages, Khelawan demanded the money he had given to defendant and made some vulgar comments about her and her mother, but no reasonable person would have interpreted any of the text messages as a threat to kill defendant's daughter, let alone harvest her hair and nails afterwards. Defendant did testify in the prior trial that Khelawan specifically threatened to kill her family and either blow up or shoot the windows out of their motel room. James corroborated that Khelawan was "cussing and yelling" on the phone and generally "talking in a threatening manner," but he did not hear

17

a specific threat. Even if we were to conclude this testimony was sufficient to establish the threat was made, based on the facts of this case, such a threat did not warrant instructing on voluntary manslaughter.

In *People v. Cole* (2004) 33 Cal.4th 1158, our Supreme Court held a cohabitant girlfriend's threat, during a heated argument, that she would "put a 'butcher knife in [the defendant's] ass'" did not satisfy the objective element of heat of passion, explaining the cohabitant was "in bed when defendant began his physical assault by pouring gasoline on her" and their conduct during the argument "was no different than the many other occasions on which they had argued in their five-year relationship." (*Id*. at p. 1216.) Here, defendant's argument with Khelawan took place over the phone, through text messages and a single phone call, which may have included the above-mentioned threat to kill defendant's family. This phone call occurred during defendant's drive to her family's motel room. When defendant and James reached the motel room, Khelawan was not there and had not been there that night. They then set out in search of him, during which time defendant renewed her proposal to James that they rob Khelawan at gunpoint. Even assuming the purported threat against defendant's family satisfied the subjective element of heat of passion, no reasonable person would have continued to be so overcome by passion as to act rashly or without due deliberation and reflection *after finding out that her family was fine*. In other words, like *Cole*, the purported provocation (in both cases, the argument and threat) was sufficiently removed from the ultimate act (there, the defendant's lighting of his girlfriend on fire while she was in bed; here, chasing Khelawan down the street some distance from the motel and placing James in a position to shoot him) no reasonable person would have had a continued loss of reason or judgment at the time the act was committed.

The only facts remaining to support a heat of passion theory are the break-up itself and certain vulgar comments Khelawan made about defendant and her mother. The

18

vulgar comments are not sufficient provocation. (See, e.g., *People v. Gutierrez* (2009) 45 Cal.4th 789, 827 [cussing at defendant not sufficient provocation]; *People v. Manriquez* (2005) 37 Cal.4th 547, 586 [calling defendant a "'mother fucker'" and taunting him to take out his weapon and use it not sufficient provocation].) Nor are we persuaded by defendant's reliance on cases involving infidelity. (See, e.g., *People v. Berry* (1976) 18 Cal.3d 509, 513-516 ["two-week period of provocatory conduct" by wife in which she "alternately taunted defendant with her involvement with [another man] and at the same time sexually excited defendant, indicating her desire to remain with him"]; *People v. Borchers* (1958) 50 Cal.2d 321, 328-329 ["series of events over a considerable period of time," including wife's "admitted infidelity, her statements that she wished she were dead, her attempt to jump from the car on the trip to San Diego, her repeated urging that defendant shoot her, [her son], and himself on the night of the homicide, and her taunt, 'are you chicken'"].) While the purported reason for the break-up was a nude picture Khelawan apparently received from another woman, defendant was admittedly dating multiple men at the time Khelawan received this picture. Defendant also admitted she was merely stringing Khelawan along "so he would give [her] money." Simply put, the relationship between defendant and Khelawan was not serious enough for defendant to invoke this line of cases.

We conclude there is no substantial evidence supporting instruction on heat of passion voluntary manslaughter.

### III

### *Cumulative Prejudice*

Having rejected defendant's assertions of instructional error, we must also reject her additional claim the cumulative effect of these assertions of error amounted to a violation of her constitutional rights requiring reversal. (See *People v. Boyer* (2006) 38 Cal.4th 412, 489.)

19

## IV

### *Sentencing Error*

Turning to sentencing, defendant claims the trial court erred by imposing a consecutive one-third the middle term sentence on her conviction for shooting at an occupied vehicle (Count Three) before staying execution of that sentence under section 654. The Attorney General concedes the point and asks that we exercise our authority to modify the judgment to impose a middle term sentence and stay execution of this sentence under section 654, as we did in *People v. Alford* (2010) 180 Cal.App.4th 1463. We accept the concession. Using the one-third of the middle term formula is inappropriate because the sentence was stayed under section 654. (§ 1170.1, subd. (a).) We modify the judgment to impose a middle term sentence of five years for Count Three and stay execution of this sentence. This modification of the judgment is consistent with the abstract of judgment, so no modification of the abstract is required.

## V

### *Correction of the Abstract of Judgment*

The abstract of judgment does require correction in one respect. As defendant points out, and as the Attorney General concedes, the abstract of judgment reflects two one-year firearm enhancements—one attached to defendant's murder conviction (Count One) and one attached to the assault with a semi-automatic firearm conviction (Count Two). Only one such enhancement was found true and imposed by the trial court—the former, attached to Count One. Accordingly, we order the abstract of judgment corrected to remove reference to the latter enhancement.

## DISPOSITION

The judgment is modified to impose a middle term sentence of five years on Count Three, stayed pursuant to Penal Code section 654. As so modified, the judgment is affirmed. The trial court shall correct the abstract of judgment to reflect a single one-year

20

firearm enhancement attached to Count One and remove the reference to a second such enhancement purportedly attached to Count Two. A certified copy of the corrected abstract of judgment shall be forwarded to the Department of Corrections and Rehabilitation.


                                                        _____HOCH_____, J.



We concur:



_____BLEASE_____, Acting P. J.



_____BUTZ_____, J.